**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PAMELA JOHNSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| CLARK, LOVE & HUTSON, G.P., LEE | ) | |
| MURPHY, G.P., CLAYTON A. CLARK, | ) | |
| CLAYTON A. CLARK, ESQ., PC, SCOTT | ) | **JURY TRIAL DEMANDED** |
| A. LOVE, SCOTT A. LOVE, PC, SHELLY | ) | |
| HUTSON, HUTSON LAW FIRM, P.C., | ) | |
| JAMES LEE, JR., JAMES LEE LAW FIRM, | ) | |
| PC, and ERIN MURPHY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Plaintiff Pamela Johnson brings this Complaint against Defendants Clark, Love & Hutson, G.P., Lee & Murphy Law Firm, G.P., Clayton A. Clark, Clayton A. Clark, Esq., PC, Scott A. Love, Scott A. Love, PC, Shelly Hutson, Hutson Law Firm, P.C., James Lee, Jr., James Lee Law Firm, PC, and Erin Murphy, and complains and alleges upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigations conducted by her attorneys, the following:

## I.  NATURE OF THE CASE

1. This case involves the Defendants' breach of the fiduciary duties owed by them to their clients in connection with their failure to disclose that they blew the statute of limitations for hundreds, and potentially thousands of clients.

2.      This case arises from one of the largest, if not the largest, multi-district litigation ("MDL") in history—the transvaginal mesh ("TVM") mass tort cases in the United States District Court for the Southern District of West Virginia, which involved over 100,000 plaintiffs, seven separate MDLs against assorted manufacturers, and hundreds of law firms. The TVM cases involve allegations that the various manufacturers' TVM products were poorly designed and dangerous, necessitating tens of thousands of surgeries to remove, repair or replace the original TVM product.  The manufacturers' defective TVM products damaged tens of thousands of women, many irreparably.

3.      Thirty-four TVM cases have been tried in state or federal court.  Twenty-six (26) cases have resulted in jury verdicts against mesh manufacturers totaling more than $545 million, for an average award of $20.9 million.

4.      The vast majority of the individual TVM cases that were not tried were settled, frequently as part of an aggregate settlement in which a law firm would bundle together all of its clients who had claims against a particular manufacturer, and settle all of the law firm's client portfolio against a given manufacturer for a lump sum settlement figure. The law firm's individual clients could then choose to participate in the aggregate settlement or, in theory, continue with their individual lawsuits. The settlement amounts would in turn be allocated among the clients based on a host of negotiated factors designed to award more money to those with the strongest cases, and the individual allocations would be approved by a Court-appointed Special Master.

5.      As a result, the lump sum settlement figure for a particular settlement is dependent upon the strengths and weaknesses of the law firm's client portfolio. A portfolio with many strong claims (*e.g.*, younger women, multiple revision surgeries) has a higher settlement

value than one with many weak claims (older women, few revision surgeries), and accordingly will settle for a higher lump sum amount.

6.      In order to comply with their fiduciary and ethical obligations to their clients, as part of obtaining client consent to participate in an aggregate settlement, lawyers are required to inform the clients of, among other things, the existence, nature and extent of the claims and defenses involved in the aggregate settlement so that clients can make informed decisions.

7.      That did not happen here. Instead, the Defendants, lawyers who were handling approximately 26,000 individual cases just with respect to TVM alone, missed the statute of limitations filing deadlines for ***hundreds, and potentially thousands*** of cases, and then, rather than disclosing that problem, included those time-barred cases in aggregate settlements totaling nearly a ***billion*** dollars. Defendants did this without telling Plaintiff, and upon information and belief, without telling ***any*** of their participating clients—either (a) the clients whose claims were subject to being barred by the statute of limitations or (b) those clients whose claims were not subject to such a defense. As a result, the Plaintiff and Defendants' TVM clients participated in the settlements without understanding that the aggregate settlement included many time-barred claims.

8.      The facts and ramifications about the inclusion of time-barred cases were material and necessary facts that must have been disclosed by Defendants to Plaintiff and Defendants' other TVM clients in order to obtain their informed consent to proceed with lump sum aggregate settlements. These facts were never disclosed.

9.      Defendants' failure to disclose the statute of limitations issues to Plaintiff and Defendants' other TVM clients is a breach of fiduciary duty by Defendants, as attorneys, to their clients.

10.     Plaintiff brings this case to recoup the attorneys' fees received by the Defendants for their breaches of fiduciary duty in handling Plaintiff's claims which were included in TVM aggregate settlements.

11.     A fiduciary owes its principal one of the highest duties known to law – this is a very special relationship.  *See, e.g., Ditta v. Conte*, 298 S.W.3d 187, 191 (Tex. 2009).

12.     The Texas Supreme Court has expressly held that attorneys' fee forfeiture is one available remedy for breach of fiduciary duty.

13.     Plaintiff also brings this case to recoup damages for the value of their claims had they been timely filed and properly handled by Defendants.  To date, the reasonable value of those claims should be approximately $20.9 million dollars each or collectively $83.6 million.  Plaintiff is also seeking exemplary damages due to Defendants' breach of fiduciary duty and for fraud.

14.     Upon information and belief, the total amount of attorney's fees collected by Defendants in these aggregate settlements are estimated to *exceed $250 million*.

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff's claim exceeds $75,000,000 exclusive of interests and costs, and exemplary damages. Plaintiff is a citizen of California while all Defendants are Texas citizens.

16.     This Court has general jurisdiction over Defendants because they are Texas citizens. This Court also has specific jurisdiction over Defendants because the legal representation, breach of fiduciary duty, and fraud occurred, at least in part, in Texas.

17.     Venue is proper in this judicial District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c)(2) because Defendants reside or conduct business within this District.  Moreover, venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims emanated from activities within this District.

### III.     PARTIES

*Plaintiff*

18.     Plaintiff Pamela Johnson is a resident of Mission Viejo, California and is a citizen of California.

*Defendants*

19.     Defendant Clark, Love & Hutson, G.P. ("CLH") is a nationally recognized mass tort law firm based in Houston, Texas. CLH is a general partnership doing business in Harris County, Texas..

20.     Defendant Lee & Murphy Law Firm, G.P. ("LM") is a law firm based in Houston, Texas.  LM is a a general partnership doing business in Harris County, Texas..

21.     Defendant Clayton A. Clark is the managing partner of CLH. Clayton A. Clark is also incorporated as Clayton A. Clark, Esq., PC.  Both Clayton A. Clark and Clayton A. Clark, Esq. PC are named as Defendants and will be referred to collectively as "Clark."  Clark is a citizen of Texas.

22.     Defendant Scott A. Love is a partner of CLH. Scott A. Love is also incorporated as Scott A. Love, PC. Both Scott A. Love and Scott A. Love, PC are named as Defendants and will be referred to collectively as "Love."  Love is a citizen of Texas.

23.     Defendant Shelly Hutson is a partner of CLH. Shelly Huston is also incorporated as Hutson Law Firm, P.C. Both Shelly Hutson and Hutson Law Firm, P.C. are

named as Defendants and will be referred to collectively as "Hutson." Hutson is a citizen of Texas.

24.     Defendant James Lee, Jr. is a partner at LM.  James Lee, Jr. is incorporated as James Lee Law Firm, PC. Both James Lee, Jr. and James Lee Law Firm, PC are named as Defendants and will be referred to collectively as "Lee."  Lee is a citizen of Texas.

25.     Defendant Erin Murphy ("Murphy") is a partner at LM.  Murphy is a citizen of Texas.

## IV.    BACKGROUND FACTS

### *TVM Devices*

26.     TVM devices are derived from polypropylene and are used to treat medical conditions in the female pelvis, primarily pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI").  These conditions generally occur when the muscles in the pelvic region weaken and are no longer able to hold organs in place, permitting them to fall or cause incontinence. They began to gain widespread use in the early 2000s. Unfortunately, while surgical mesh had been successfully used for decades for other applications, this treatment worked poorly to treat women's pelvic regions.

27.     The largest four manufacturers of TVM devices are American Medical Systems ("AMS"), Boston Scientific Corporation ("BSC"), Ethicon (a Johnson & Johnson company) and C.R. Bard ("Bard").  Millions of these devices were sold in the United States.

28.     In October 2008, the FDA issued a Public Health Notification to notify patients and doctors about the adverse side effects associated with TVM implantation to repair POP and SUI.  Nearly three years later, in July 2011, the FDA amended its 2008 notification by stating that serious adverse events from the implantation of TVM are not rare. The update also

concluded that TVM did not appear to provide any medical benefit over traditional surgeries without mesh and may add an additional risk to patients.

29.      Not surprisingly, in light of the FDA's findings and increasing patient complaints, TVM litigation began to grow, and some mass tort law firms began advertising for TVM cases.

### The CLH Business Model

30.      CLH focuses on mass torts, in particular those involving pharmaceutical drugs and medical devices.  CLH consists of three partners: Clark, Love and Hutson. In addition to the partners, CLH employs approximately 8 to 10 associates.  CLH claims on its website that it has obtained settlements and verdicts of more than $1.5 billion.  CLH typically handles a docket of 40,000 to 50,000 individual plaintiffs (or entities) a year.

31.      CLH worked closely with LM, another Houston law firm located in the same building, in representing tens of thousands of individuals injured by dangerous pharmaceutical drugs and medical devices.

32.      In the wake of the July 2011 FDA update to the TVM warnings, many law firms including CLH, began advertising for TVM cases.  CLH used Keith Cohn, FindLaw and possibly other marketing agencies to run television advertisements to market TVM clients.[1]

33.      To handle the anticipated volume of cases, CLH formed a joint venture with LM.  CLH and LM were not new acquaintances.  James Lee, one of the two partners in LM, had

_____

[1] [1] On June 24, 2015, Cohn sued CLH and Clark, claiming he had spent millions on television advertising for CLH, and had been defrauded and underpaid by CLH. See Cohn v. Clayton A. Clark et al., No. 2015-36610 (Harris Co., Tex.).  Cohn claimed CLH spent approximately $10 million on television advertising between 2010 and 2013.

previously been partners with CLH's Clark prior to the formation of LM.  And Erin Murphy, the

other partner in LM, had been an associate at CLH prior to forming LM with James Lee.[2][2]

34.     Under their joint venture agreement to prosecute TVM claims, CLH and LM

were responsible for the following: (a) building, maintaining and updating extensive databases to

warehouse TVM client databases; (b) ordering, following-up, receiving and processing

thousands of medical records from each client's doctors, hospitals and pharmacies; (c) hiring

doctors and nurses to review and summarize voluminous medical and pharmaceutical, and client

records; and (d) preparing individual claim documents, litigation documents, and settlement

documents on behalf of each client for submission to defendants and/or filing with the court.

35.     Previously, CLH had paid substantial sums of money to third-party vendors to

perform these services. To save on these substantial costs and increase their own profits on

clients' cases, CLH and LM formed their own litigation support company, Litigation & Records

Services ("LRS").  By forming LRS, CLH and LM were able to collect attorneys' fees and then

also charge for additional back office support, data entry, records retrieval, and medical review

services, which would normally be included as part of the work covered by the attorneys'

fees.  In other words, LRS enabled CLH and LM to share in additional payments to the clients

above and beyond the attorneys' fees.

36.     Not only did CLH and LM form LRS, they staffed it with their own

people. Erin Murphy, one of the two partners at LM, is also the President of LRS.  And Marco

---

[2] [2] Alas, this relationship also soured.  In July 2018, LM sued CLH for breach of fiduciary duty and breach of contract for failure to pay fees allegedly owed due to the TVM claims and other campaigns LM and CLH worked on together. See Lee Murphy Law Firm, G.P., et al. v. Clayton A. Clark et al., No. 2018-47009 (234th Dist. Ct., Harris Co., Tex. July 16, 2018).

Zubieta, who was also an employee at LM and helped manage the database that housed all of the TVM client files, was the Chief Operations Officer of LRS.

37.     LRS was formed on December 20, 2011, shortly after CLH and LM began advertising for TVM clients. However, newly formed LRS was not capable of handling the litigation support services for the large volume of TVM clients that CLH and LM were rapidly acquiring.  As a result, CLH, LM and LRS hired QTAT BPO Solutions, Inc. ("QTAT") to assist.

38.     The litigation support services performed by QTAT were to include back office work, paralegal work, and medical record reviews.  In exchange for those services, QTAT was to be paid for its reasonable and necessary invoices and also receive 25% of the profits from LRS.[3][3]

39.     In any event, as women called in response to the television advertising, CLH, LM and LRS coordinated to sign up the clients on behalf of Lee Murphy and CLH.  And QTAT did the outsourced litigation support that LRS was unable to do.  Clients would call a dedicated (800) number which would be routed to a call center.  Once the call center received the calls from potential clients, it would screen them by asking questions to determine whether or not the clients took a qualifying drug or had a qualifying medical device.  After the potential clients were screened by the call center, qualifying clients would be sent a packet consisting of questionnaires, HIPAA authorizations and attorney-client fee contracts.  Once the clients filled

---

[3] [3] Like the other CLH relationships, this also ended in litigation. QTAT was paid nearly $1.9 million for its services but was never paid any profit percentage.  QTAT sued CLH and LM for failing to pay for QTAT's work. QTAT BPO Solutions, Inc. v Litigation & Record Services, LLC, et al., No. 2015-50482 (Harris Co., Texas).

out these packets and returned them to CLH and LM, the attorney-client relationship was formed.

40.     All told, CLH and LM signed up, and were retained by, **_over 26,000 TVM clients_**.

41.     The client agreements that CLH and LM had with their clients were contingency fee agreements in which the law firms would typically get 40 percent of any recovery and would advance costs.  Once those agreements were signed, and CLH and LM were retained, a fiduciary relationship was established as a matter of law.  This fiduciary relationship included the responsibility that CLH and LM would inform their clients of all material matters and developments that might affect their clients' cases.  As part of that undertaking, CLH and LM were duty bound to timely file suit on each client's claim prior to the expiration of the statute of limitations.

### *The MDL Filings*

42.     CLH and LM were not the only law firms to advertise, and acquire, TVM clients. Several hundred law firms ended up filing cases in various courts around the country. Ultimately, seven different MDLs were formed—based on the TVM device manufacturer—and ended up being assigned to Judge Joseph R. Goodwin in the Southern District of West Virginia.  Those cases involved over 100,000 plaintiffs.

43.     A separate MDL was created for each of the four major defendants:

(a)  *In re: C.R. Bard, Inc. Pelvic Repair Systems Products Liability Litigation*, MDL No. 2187, pending in the United States District Court for the Southern District of West Virginia.

(b)   *In re: American Medical Systems, Inc. Pelvic Repair Systems Products Liability Litigation*, MDL No. 2325, pending in the United States District Court for the Southern District of West Virginia.

(c)   *In re: Boston Scientific Corp. Pelvic Repair Systems Products Liability Litigation*, MDL No. 2326, pending in the United States District Court for the Southern District of West Virginia.

(d)   *In re: Ethicon, Inc. Pelvic Repair Systems Products Liability Litigation*, MDL No. 2327, pending in the United States District Court for the Southern District of West Virginia.

44.      In addition, separate MDLs were created for three additional defendants: Coloplast Corp. (MDL No.2387), Cook Medical, Inc. (MDL No. 2440), and Neomedic (MDL No. 2440).

45.      Due to the sheer size of the CLH and LM client portfolio, and CLH's considerable previous experience in several high profile mass tort cases (such as Fen Phen, Zyprexa, Trasylol, Topamax, Paxil, Yaz, Invokana, Pradaxa, and Avandia), CLH was able to obtain a leadership position in the MDLs for the four largest defendants (AMS, BSC, Ethicon, and Bard). In fact, CLH's Clark was appointed co-lead counsel for all plaintiffs in the BSC MDL and was appointed to the Executive Committee for the other three large MDLs. These leadership positions would prove to be lucrative, as ultimately all individual TVM settlements paid 5% into the MDL settlements funds to pay for common attorney work and common expenses. That 5% ended up being over ***$370 million and*** is expected to grow to ***$550 million.*** Those fees are independent of the 40% attorneys' fees collected by each client's personal attorneys.

- 11 -

46.     Coupled with that lucrative payday was that CLH and Clark had fiduciary duties to all of those plaintiffs as a result of those Court appointments, notwithstanding that those plaintiffs were also represented by other mass tort law firms across the country.

### The MDL Delayed Filing Order

47.     Because of the large volume of cases being filed in the MDLs, in 2013 Judge Goodwin issued an order that required plaintiffs to temporarily discontinue filing new cases in the MDLs, and instead serve a short form complaint on the applicable defendants. Per the Court's order, the date on which a defendant was served with a short form complaint would serve as the court filing date for purposes of the statute of limitations, provided that the complaint was subsequently filed in the MDL by a certain deadline. This would permit the Clerk's Office to catch up and process the huge volume of filings already made, while protecting plaintiffs who had not yet filed from any potential statute of limitations problem.

48.     Originally, the Court's order provided that all cases served on defendants, but not filed in the MDL, from May 29, 2013 to October 1, 2013, would be deemed to have been filed on the service date provided the case was filed in the MDL by November 1, 2013. Judge Goodwin subsequently amended this order twice, extending the November 1, 2013 filing deadline to January 15, 2014, and then later extending the January 15, 2014 filing deadline to February 14, 2014. Thus, pursuant to Pretrial Order (Third Amended Order) ("Delayed Filing Order"), all cases served on defendants but not filed in the MDL between May 29, 2013 and October 1, 2013, needed to be filed in the MDL by February 14, 2014 in order to receive the benefit of having the service date serve as the filing date.[4][4] The Delayed Filing Order

---

[4] [4] The Pretrial Order number varies depending on the MDL in which it was filed. Thus, the Delayed Filing Order is Pretrial Order No. 68 in MDL No. 2326 (Boston Scientific), while the same order is Pretrial

specifically provided that if the complaint was not filed by February 14, 2014 in the MDL, then absent an agreement between the parties in writing, the complaint would not be deemed filed as of the service date, but would instead be treated as filed on the actual date of filing.

49.     The result was that for those law firms who served large volumes of complaints during the May 29, 2013 to October 1, 2013 time period, they had three and a half months to file those complaints in order to receive the benefit of the delayed filing order.[5]

***Defendants Blow Hundreds, and Potentially Thousands of Statutes of Limitations***

50.     Unfortunately, CLH and LM mismanaged this process.

51.     Upon information and belief, CLH served hundreds, if not thousands, of cases during the 2013 moratorium on filing.  This provided a significant cost savings to CLH since it could serve the complaints without having to pay a filing fee for each complaint—but also created a significant future expense.  In 2013 and early 2014, the filing fee for in the Southern District of West Virginia was approximately 400.00.  Assuming 7,000 cases had been served and not filed, CLH would need to spend over $2 million in order to file its backlog of cases.

52.     In addition, CLH and LM were thinly staffed to process such a large volume of cases.

---

Order No. 175 in MDL No. 2325 (AMS), Pretrial Order No . 99   in MDL No. 2187 (C.R. Bard), and Pretrial Order No. 91 in MDL No. 2327 (Ethicon).


[5] [5] Of course, not all such cases had to be filed by the February 14, 2014 deadline—just those whose statute of limitations would have expired before February 14, 2014, absent tolling.  For those cases for which the statute of limitations would not run until a later point, for example, 2015, the benefit of the tolling provision from the Delayed Filing Order was not necessary. But that was a minority of the cases, as many product liability statutes of limitation (e.g., California) are two years from discovery of the injury.

53.       The result was that although CLH managed to file some cases in the MDLs in 2014 prior to the February 14, 2014 deadline, it missed the deadline for hundreds, and potentially thousands of cases.

54.       In addition to those cases that CLH and LM served but did not file in the respective MDLs, there were hundreds, and potentially thousands of cases that were neither served nor filed.  Those cases were not eligible for the Delayed Filing Order tolling provisions because they were not served on the manufacturing defendants as required by the Order.  The result was that many of these "pre-litigation" cases were also barred by the statute of limitations by 2014 (as CLH and LM had been signing up clients since 2011).

55.       Thus, as of early 2014, CLH and LM had hundreds, and potentially thousands of cases that either (a) had been served in the MDL and needed to be filed by the February 14, 2014 deadline or (b) had not been served or filed anywhere and whose statute of limitations had already expired, or was about to expire.

56.       CLH, LM and each named defendant were well aware of this problem.  CLH, LM and LRS maintained their TVM files in a database which was a customized version of MR8. MR8 (hereinafter "Defendants' Database") was released in June of 2013. Defendants' Database system has a medical records retrieval ("MRR") side ("MR8-standard") and a CLAIMS side ("MR8-custom"). The Defendants' Database contained client communication information and litigation information. This client communication and litigation information would also include the dates the prospective clients contacted the Defendants and when the Defendants received contingency fee agreements to allow the firms to determine the applicable statute of limitations for each prospective client.

57.     Upon information and belief, the database tracked all the cases that CLH or LM served pursuant to the Delayed Filing Order, when those cases were served, and whether or not they had been filed in the MDL or anywhere else. Consistent with tracking litigation information, the Database would have tracked all the cases that CLH or LM served pursuant to the Delayed Filing Order, when those cases were served, and whether or not they had been filed in the MDL or anywhere else.

### CLH Hides the Blown Cases in "Bulk Filings"

58.     Upon realizing the magnitude of this problem, and the ensuring liability that would result, CLH and LM took steps to minimize their exposure.

59.     CLH submitted "bulk filings" in Missouri, Texas, California, and presumably other state courts to conceal the issue. Specifically, CLH would file a single complaint in Missouri, Texas or California state court, with 60-90 plaintiffs joined in a single complaint, and would assert claims on behalf of each plaintiff against a manufacturer defendant.

60.     Filing TVM cases in state court in groups of less than 100 plaintiffs permitted CLH and LM to pay a single filing fee for each group and force the manufacturer defendants to remove the cases to federal court and then seek a transfer to the MDL dockets pending in front of Judge Goodwin.  This would take time for the manufacturer defendants to accomplish.

61.     But something far more sinister was going on.  CLH wasn't just filing cases in state courts in circumvention of the MDL and saving filing fees. CLH was including **hundreds** of claims in the state court filings for which **it had already served short form complaints in the MDL.** There was no legitimate reason for CLH to do so.  But that is what CLH did, as is clear from the removal petitions filed by the various manufacturer defendants in those cases.

- 15 -

62.     In *Barnes et al. v. Boston Scientific Corp.*, No. 4:14-cv-00460-JCH (E.D. Mo. March 12, 2014), CLH filed a single case with 92 plaintiffs from 27 different states; CLH had already served short form complaints on behalf of 41 of those plaintiffs in the MDL, but had failed to file them in the MDL (Dkt. 1 at 9, 12.)

63.     In *Stevens v. Johnson & Johnson, Inc.*, No. 4:14-cv-579 (E.D. Mo. March 25, 2014), CLH filed a single case with 87 plaintiffs from 22 different states; but CLH had already served claims on behalf of 74 of those plaintiffs in the MDL. (Dkt. 1 at 6.)

64.      In *Heredia v. Johnson & Johnson*, No. 8:14-cv-00596 (C.D. Cal. April 16, 2014), CLH filed a single case with 63 plaintiffs from 22 different states; but CLH had already served short form complaints on behalf of 56 of those plaintiffs in the MDL. (Dkt. 1 at 2, 13.)  This case was filed in state court in California on February 18, 2014.

65.     In *Baron v. Johnson & Johnson*, No. 8:14-cv-00591 (C.D. Cal. April 16, 2014), CLH filed a single case with 95 plaintiffs from 23 different states; but CLH had already served short form complaints on behalf of 82 of those plaintiffs in the MDL. (Dkt. 1 at 2, 14.)  This case was filed in state court in California on February 18, 2014.

66.     In *Vanessa Cunningham, et al v. American Medical Systems, et al*; In the 334th Judicial District Court of Harris County, Texas, CLH filed a single case with 89 plaintiffs from 14 different states.  This case was filed in state court in Texas on February 24, 2014.

67.     In *Vasquez v. Johnson & Johnson*, No. 2:14-cv-02915 (C.D. Cal. April 14, 2016), CLH filed a single case with 95 plaintiffs from 30 different states; but CLH had already served short form complaints on behalf of 85 of those plaintiffs in the MDL. (Dkt. 1 at 14.)  This case was filed in state court in California on February 13, 2014.

68.     In *Cuevas, et al v. Ethicon, LLC, et al*; No. 1622-CC11538; In the 22nd Judicial Circuit Court, St. Louis City, Missouri, CLH filed 46 plaintiffs from 7 different states.  This bulk filing was initiated on December 14, 2016.

69.     Plaintiff suspects that there are additional bulk filings that Plaintiff has not yet located or were filed on behalf of CLH by other affiliated law firms.

70.     The sheer volume of bulk court filings undercuts any claim of inadvertence. The obvious explanation is CLH did this in order to hide the blown statute of limitation issue.  Bulk filings permitted CLH and LM to postpone—perhaps forever—the day of reckoning for those delayed filing cases that they had failed to file by the February 14, 2014 MDL deadline and other cases that had never been served or filed in the MDL at all.  Filing those cases after that deadline would likely result in them being dismissed as barred by the statute of limitations in the MDL.  This would likely cause Judge Goodwin to view CLH and LM less than favorably going forward in those cases should Judge Goodwin dismiss hundreds and potentially thousands of their cases as barred by the statute of limitations.  But filing those cases in state courts meant that if those time-barred cases were removed and transferred to the MDL, they would likely remain in the MDL and would likely not be before the Court for an extended period of time due to the overwhelming number of cases already in the MDL.

71.     In the meantime, CLH and LM could use the delay to negotiate settlements on behalf of all of their TVM clients and include the time-barred claims with the timely claims. Although presumably at least some of the manufacturer defendants figured this out—as for at least the cases that had been served and not filed the manufacturer defendants would be aware that the cases had not been filed by the MDL deadline—and would most likely have demanded a lower aggregate settlement amount for portfolios with time-barred claims, certainly CLH and

LM recognized they had reduced leverage in any settlement negotiations that included such cases.[6][6]

72.     And that's what CLH and LM did—they settled their case portfolios with each of the large manufacturers and included both timely and untimely claims in the aggregate settlements—without informing their clients, the Court or any appointed Special Masters.

### *CLH and LM Settle Their TVM Portfolio*

73.     Notwithstanding that CLH's Clark was co-lead counsel in the BSC MDL, and that CLH was on the Executive Committee for the other three large TVM MDLs, CLH did not attempt to settle all claims against a particular defendant in a master settlement agreement, which would treat all clients with claims against a particular manufacturing defendant in a consistent matter, regardless of which law firm represented them.  Instead, CLH decided to settle only the CLH/LM cases with each defendant, leaving the other plaintiffs and their counsel to fend for themselves, including those in the BSC MDL.

74.     Thus, in mid-to late- 2014 to 2015, CLH and LM began settling their TVM client portfolios with AMS, Ethicon, BSC and Bard. Plaintiff believes those settlements involved approximately 15,000 to 20,000 TVM clients for approximately $750 million to $1 billion paid by those four defendants, with attorneys' fees in the range of *$250 to $330 million.*

75.     In addition, 5% of all settlement amounts for TVM claims settled in connection with the various MDLs was set aside for attorneys' fees for work done for the MDLs

---

[6] [6] For example, BSC, in removing one of CLH's bulk filed cases, noted that, of the 92 plaintiffs who were attempting to join their claims in Missouri state court, 41 of the plaintiffs had served BSC with short form complaints in the MDL, "but never filed their cases by the deadline ordered by the MDL court." (Barnes et al. v. Boston Scientific Corp., No. 4:14-cv-00460-JCH, Dkt. 1 at 12 (emphasis in original).)

as a whole, with a Common Benefit and Cost Committee appointed by Judge Goodwin to allocate those fees. Those fees currently are approximately $370 million and are projected to reach $550 million by the time all cases are resolved. In the first round of fee allocations, the Common Benefit and Cost Committee—of which CLH's Clark is a member—recommended CLH receive an additional **$45.5 million** in attorneys' fees, *and* a proportionate share of future common fees thereafter.[7][7]

76.     Clark recently acknowledged in the Syngenta Litigation in Case 2:14-md-02591-JWL-JPO, Document 3598-5, that he "most recently played a lead role in developing the settlement frameworks with all five (5) of the primary defendants in the transvaginal mesh litigation *for the benefit of all litigants*."

*The AMS Settlement*

77.     CLH settled its TVM portfolio first with AMS. The AMS TVM settlement thus became the template for CLH's settlements with the other manufacturers.

78.     Defendants, along with Motley Rice, LLC, Blasingame, Burch Garrard & Ashley, PC, and Levin Simes, LLP pooled together 20,000 of their clients' AMS cases and settled them for $830,000,000.00. *See,*

*e.g.*, https://www.meshmedicaldevicenewsdesk.com/endo-offers-830-million-to-settle-20k-ams-

---

[7] [7] Ironically, in the Common Benefit and Cost Committee's opposition to an objection to the amount of attorneys' fees that the Committee members awarded their respective firms, the Committee noted that among the reasons that the per case average was not higher was that a "significant number of cases prepared for trial in this litigation have been dismissed by way of dispositive motion for a variety of reasons, including the learned intermediary doctrine, the statute of limitations or the application of differing state law standards . . . ." (In re C.R. Bard, Inc. Pelvic Repair Sys. Prods. Liab. Lit., No 2:10-md-02187, Dkt. No. 6847 at 12 (emphasis added).)  CLH's Clark was a signatory to the brief

pelvic-mesh-lawsuits/; https://www.reuters.com/article/us-endo-mesh-settlement/endo-agrees-to-830-million-settlement-of-vaginal-mesh-cases-idUSBREA3T15F20140430

79.     Under the settlement, the average gross settlement would be approximately $41,500.00. *Id*.

80.     With legal fees being 40 percent, the firms jointly recovered approximately $332,000,000.00 in attorney's fees from the settlement. *Id*. Assuming the four law firms placed the same number of clients into the settlement, Defendants' share of the attorney's fees would have been $83,000,000.00. *Id*.

81.     In these type of aggregate settlements, it is customary for the agreements to contain provisions that do not require the defendant manufacturer to fund the settlement until at least 90-95 percent of the clients consent to participation in the settlement. Here, it is presumed that sometime in 2014 or early 2015 that the threshold was met due to the distribution of funds to Defendants clients.

82.     Aggregate settlements, including the TVM settlements at issue, are typically allocated to individuals based upon a points formula. The points formula includes numerous factors depending on the severity of the injuries, age, and whether other defendants were potentially liable. The total points were then added up and multiplied by the per point value.

83.     CLH informed its clients of the settlement by sending them a settlement packet. The settlement packet contained a disclosure letter attempting to explain certain aspects of the settlement, a form for the client to acknowledge she had read the disclosure letter, a confidential release and indemnity, a client statement concerning bankruptcy, an election form, an expense disclosure and potential conflict waiver form, a client acknowledgement of co-

counsel, a public assistance benefits brochure, and an acknowledgement of the extended injury benefit and future surgery form.

84.     The disclosure letter and acknowledgement told each client that CLH had achieved an aggregate settlement with the respective manufacturer and provided the minimum gross amount she would receive if she accepted the settlement and executed the release.

85.     CLH *strongly recommended to each client that she accept the settlement amount because it was a fair and reasonable settlement amount*.  While doing so, CLH noted that the client could refuse the proposed settlement, and instead retain another attorney to litigate their claims in court against AMS.  In other words, *failure to accept the settlement meant that the client would be left without a lawyer*.  Therefore, Plaintiff was left with no alternative accept to take the manufacturer's settlement offer.

86.     The disclosure letter contained a chart providing the individual client's total points allocation, and how that total points allocation compared to the entirety of the group.

87.     However, the clients were *not* informed that their individual claims may not have been filed, or were filed late, and would now be subject to dismissal on statutes of limitation grounds should they choose to pursue their claims and not accept the settlement.

88.     Nor were the clients informed that the aggregate settlement included individuals with time-barred claims, and that the defendants were aware that time-barred claims were being included in the overall group settlement.

89.     The settlements were labeled as confidential, and clients were informed that they faced monetary and legal consequences should they breach the confidentiality of the settlement.  However, the confidentiality agreements precluded the release of information, such as Plaintiff's settlement amount, the fees received by Defendants, and expenses, all of which are

vital to Plaintiff's claims. These items must be revealed if they are "vital to claims made in litigation." *In re Sealing & NonDisclosure*, 562 F.Supp.2d 876, 890 (S.D. Tex. 2008). As a result, Plaintiff will be asking the Court to allow the settlement amounts, attorney's fees and expenses to be included in an Amended Complaint for public disclosure.

90.    If the client accepted the settlement, the client released all claims against AMS, including those involving unknown facts or facts later discovered.

### CLH's and LM's Post-Settlement Role

91.    CLH's and LM's role did not end with the settlements.

92.    Rather than have the individual settlements fully resolved in the respective MDLs, CLH dismissed the individual cases in the MDLs and resolved their settlements in state court in Texas.  But not in Houston, which was in close proximity to CLH and LM.  Instead, CLH resolved their settlements in small town called Wharton, Texas, with a population of less than 9,000. Those settlements were routinely filed under seal, thus insulating the settlements from further scrutiny—and concealing the statute of limitations problem.

93.    Once in Wharton County, CLH would ask the Court to appoint Special Masters to approve the allocations of the individual amounts to be paid to each of the clients. Notably, that Special Master process was limited to how the total gross amount of the aggregate settlement was to be distributed to the clients—and had nothing to do with whether the total settlement amount was reasonable or fair.  Nor did it involve any examination concerning the statutes of limitation, the timeliness of any claims, or whether the claims had been filed.

94.     As part of that process, CLH would also ask that Scott Freeman ("Freeman") and The Settlement Alliance ("TSA")[8][8] be appointed as trustee to oversee the qualified settlement funds for their clients.  TSA provides structured settlements and trust administration services for mass tort cases.  Freeman is the founder and Chief Executive Officer of TSA.  Freeman has served as a qualified settlement fund trustee for many, if not all, of CLH's mass tort settlements since 2014.  In addition to handling CLH's qualified settlement funds, Freeman has done so for many other mass tort law firms who also had cases in the TVM MDLs.

95.      In 2017, while it continued to serve as a qualified settlement fund trustee, TSA merged with Shapiro Settlement Solutions ("Shapiro") (a company that handled lien resolutions for clients represented by mass tort law firms, including CLH) into a holding company called Archer Systems.[9][9]

96.     As it turns out, employees from CLH and LM have found their way to Archer Systems, including employees who may have knowledge of the blown statute of limitations issue and subsequent efforts to conceal the same.  Indeed, Blake Deady, formerly a partner with CLH and who was heavily involved as co-counsel in TVM litigation, is now the President and General Counsel of Archer Systems.  And Marco Zubieta, who was the Chief Operations Officer of LRS and an employee of LM, is now the Director of Operations for Archer Systems. Upon information and belief, Deady and Zubieta, along with Freeman, are running Archer

---

[8] [8]   TSA is now known as Sage Settlement Consulting[9] Plaintiff was offered the opportunity to have Shapiro settle any outstanding medical liens—for a fee.

[9] [9] Plaintiff was offered the opportunity to have Shapiro settle any outstanding medical liens—for a fee.

Systems. Due to the cross-hiring of employees, coupled with the fact that these employees are now officers of Archer Systems, it is reasonable to believe that CLH and Clark are involved in the management and decision making of Archer Systems.

97.     Archer Systems and/or TSA are administering settlements in other TVM cases and are serving as trustees for qualified settlement funds in several TVM cases. For example, Archer Systems is serving as the Fund Administrator for at least one of the Ethicon settlements. (MDL No. 2327, Pretrial Order No. 318.)  Archer Systems is also now administering at least some portion of the AMS settlement. TSA's and Archer Systems possible knowledge and involvement in the cover-up of the Defendants' blown statute of limitations will be a major emphasis of discovery in this action.

98.     Per a press release dated October 29, 2018, TSA merged with Millennium Settlements, Inc. to form Sage Settlement Consulting, LLC ("Sage") and become the nation's largest provider of plaintiff-focused structured settlement solutions, writing over $2 billion annually in tax-advantaged structured settlements utilized in legal settlements. Freeman is Co-Chairman of Sage.

99.     The result is that some of the people with potential knowledge of the statute of limitation problems that are the subject of this lawsuit have moved along to administer thousands of other client's settlement funds, including claims of the Defendants' clients.

100.    To prevent this Complaint from being public information to allow individuals who were represented by Defendants to learn about the nature of Defendants' actions in concealing the blown statutes, Plaintiff anticipates that Defendants will attempt to seal this Complaint as it did in *Alvarado v. C*

100.     To prevent this Complaint from being public information to allow individuals who were represented by Defendants to learn about the nature of Defendants' actions in concealing the blown statutes, Plaintiff anticipates that Defendants will attempt to seal this Complaint as it did in Alvarado v. Clark Love & Hutson, G.P.  To further prevent this action and the Alvarado case from being prosecuted, Plaintiff anticipates that Defendants will continue to frivolously sue Plaintiff's counsel in Wharton County, the same small town where Defendants filed "friendly suits."

101.     While counsel for CLH and Clark have gone to the press and proclaimed that tolling agreements entered into between the plaintiff's counsel and mesh manufacturers absolves the Defendants from any liability, no tolling agreements have been produced even though they have been requested by Plaintiff's counsel on multiple occasions.

## V.     INDIVIDUAL ALLEGATIONS

Pamela Johnson

102.      On December 12, 2005, Plaintiff Pamela Johnson had an AMS SPARC sling implant surgery.  She subsequently had a revision surgery.

103.     In or about October or November 2011, Plaintiff contacted CLH and ultimately retained CLH as her counsel.

104.     Defendants did not file a case on her behalf in the MDL.  Plaintiff is unaware of any case ever being filed on behalf of her by Defendants.

105.      In 2015, CLH settled Plaintiff's claim with AMS. By that date, the statute of limitations had run against her claim, and any lawsuit filed on her behalf would have been subject to a statute of limitations defense.

- 25 -

106.       Plaintiff anticipates that if she alleges the amount her case settled for and the amount she received under the settlement, Defendants will immediately contact the Court contending that they are Plaintiff's attorneys and ask the Court to "seal" the Complaint.  This is exactly what happened in the Alvarado case.

107.       Plaintiff will ask the Court to allow her to amend this Complaint to include those figures as they are vital to the claims in this action.  See In re Sealing and Non-Disclosure, 562 F.Supp.2d at 890.

## VI.       FRAUDULENT CONCEALMENT

108.       Plaintiff realleges and incorporates by reference the allegations made in paragraphs 1 to 107.

109.       As attorneys representing Plaintiff, Defendants had a duty to inform Plaintiff of all material facts relating to her case, including whether their claims had been timely filed by Defendants, and any subsequent settlement, aggregate or otherwise.  Defendants concealed and suppressed material facts concerning their failure to timely file complaints on behalf of Plaintiff.

110.       Defendants concealed and failed to disclose that the aggregate settlements that they recommended to the Plaintiff contained claims against which the statute of limitations had expired.

111.       Defendants have yet to make full and adequate disclosures to Plaintiff about the failures of CLH and LM to file their claims timely.

112.   It was reasonable for Plaintiff to rely upon the advice of her attorneys.  It was also reasonable for Plaintiff to enter into aggregate settlements based upon Defendants' representations and information provided to them by Defendants.

113.   Plaintiff had no way of determining that CLH and LM had failed to file timely complaints on behalf of them or other plaintiffs in the aggregate settlements.

114.   As a result of Defendants' fraudulent concealment, Plaintiff's claims could not have been discovered until recently.

## VII.   CAUSES OF ACTION

### COUNT I

### BREACH OF FIDUCIARY DUTY

115.   Plaintiff realleges and incorporates by reference the allegations made in paragraphs 1 to 107.

116.   Defendants owe a fiduciary duty to all clients who retain them to perform legal services as a matter of law.

117.   Plaintiff retained Defendants to provide them legal services in connection with claims against the TVM manufacturers.

118.   Those fiduciary duties include candor, loyalty and full disclosure.

119.   As Defendants failed to file a timely claim, Defendants breached their fiduciary duties to Plaintiff.

120.   As Defendants failed to file a timely claim, and failed to so inform Plaintiff, Defendants breached their fiduciary duties of full disclosure and loyalty.

121.     In addition, Rule 1.08(f) of the Texas Disciplinary Rules of Professional Conduct provide certain disclosure requirements concerning aggregate settlements: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregated agreement to guilty or nolo contendere plea, unless each client has consented after consultation, including disclosure of the existence and nature of all the claims or pleas involved and of the nature and extent of the participation of each person in the settlement."  Such transactions are prohibited per se.

122.     ABA Model Rule 1.8(g) provides:  "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregated agreement as to guilty or nolo contendere pleas, unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims or pleas involved and of the participation of each person in the settlements."

123.     ABA Formal Opinion 06-438 provides the minimum information that must be disclosed to clients considering an aggregate settlement includes (a) the total amount of the aggregate settlement; (b) the existence and nature of all claims and defenses involved in the settlement; (c) the details of every other client's participation in the settlement; (d) the total fees and costs to be paid he lawyers; and (e) the method by which costs are to be apportioned among the clients.

124.     Defendants negotiated aggregate settlements on behalf of Plaintiff and thousands of additional claimants.

125.     Defendants breached their fiduciary duties of full disclosure and loyalty concerning the aggregate settlements by failing to tell Plaintiff that her claim and claims of other

claimants were included in the aggregate settlements against which the statute of limitations had expired.

126.     Defendants breached their fiduciary duties of full disclosure and loyalty to Plaintiff by recommending she enter into aggregate settlements that included claims against which the statute of limitations had expired.

127.     Defendants breached their fiduciary duties of full disclosure and loyalty to Plaintiff by requiring her to sign a Disclosure Letter Acknowledgement that recited that the information required by the ABA Formal Opinion was disclosed to them, including "the existence, nature and extent of all the claims and defenses involved in the aggregate settlement," when Defendants knew this was false because of the statute of limitations issue.

128.     In addition, Defendants breached their fiduciary duty by acting in their own self-interest by settling time-barred claims in an aggregate settlement and collecting attorneys' fees on that aggregate settlement, while not telling any of the participants in the aggregate settlement about the statute of limitations issue.

129.     Defendants' conduct in failing to inform Plaintiff about the statute of limitations issue was intentional.

130.     Under Texas law, one remedy for breach of fiduciary duty against attorneys is disgorgement of attorneys' fees.  The Texas Supreme Court has expressly ruled that actual damages are not necessary in order to obtain forfeiture of any attorneys' fee for the attorney's breach of fiduciary duty.  See Burrow v. Arce, 997 S.W.2d 229, 240 (Tex. Sup. 1999). Accordingly, Plaintiff seeks the disgorgement of all attorneys' fees collected by CLH and LM in connection with their representation.

131.     In addition, Plaintiff suffered actual damages due to Defendants' breaches of fiduciary duty, including, among other things, receiving settlement amounts that were less than they would have been in the absence of Defendants' breaches.  In the event Plaintiff's claims had been timely filed and eventually tried to a jury, it is probable that Plaintiff, who endured a revision surgery, would have been awarded a verdict in excess of $20.9 million.

## COUNT II

## FRAUD BY NON-DISCLOSURE

132.     Plaintiff realleges and incorporates by reference the allegations made in paragraphs 1 to 107.

133.     Failing to disclose information is equivalent to a false representation only when particular circumstances impose a duty on a party to speak, and the party deliberately remains silent.  In re Int'l Profit Assocs. Inc., 274 S.W.3d 672, 678 (Tex. 2009).  There are seven elements of a fraud by non-disclosure or omission claim:  (1) the defendant failed to disclose facts to the plaintiff; (2) the defendant had a duty to disclose such facts; (3) the facts were material; (4) the defendant knew that the plaintiff was ignorant of the facts and did not have an equal opportunity to discovery the truth; (5) the defendant was deliberately silent and failed to disclose the facts with the intent to induce the Plaintiff to take some action; (6) the plaintiff acted in reliance on the omission or concealment; and (7) the plaintiff suffered injury as a result of acting without knowledge of the undisclosed facts.  Horizon Shipbuilding, Inc. v. Blyn II Holding, LLC, 324 S.W.3d 840, 850 (Tex. App. – Houston [14th Dist.] 2010, no pet.).

134.     Defendants failed to disclose to Plaintiff the fact that her statute of limitations had expired and/or that Defendants believed that the statutes had expired.  Furthermore,

Defendants failed to disclose that Plaintiff was involved in an aggregate settlement in which hundreds, if not thousands of other clients' statutes of limitations had been blown.

135.      Based upon relevant ethical rules and the Aggregate Settlement Rule, Defendants had a duty to disclose the fact that each Plaintiff's statute of limitations had expired prior to filing suit.  Defendants further had a duty to disclose the fact that hundreds, if not thousands of additional claimants' claims statutes had been blown in the Plaintiff's aggregate settlement.

136.      The facts were material as the expired statute of limitations precluded Plaintiff from proceeding forward with their claims even though Defendants created an allusion that the litigation-pathway was still a viable option for each Plaintiff.

137.       Defendants knew that Plaintiff were ignorant of the fact that their statute of limitations had expired, and that Plaintiff did not have an equal opportunity to discovery the truth.

138.      Defendants were deliberately silent and failed to disclose the fact that Plaintiff's statutes of limitations had expired.  This silence was intended to induce the Plaintiff to take the recommended settlement offers without proceeding to litigation, which Defendants knew and/or believed Plaintiff could not do.

139.       Plaintiff trusted Defendants and acted in reliance on Defendants' omissions or concealment.

140.       Plaintiff suffered injuries as a result of acting without knowledge that their statutes of limitations had been blown by Defendants.

## VIII.   EXEMPLARY DAMAGES

141.        Plaintiff realleges and incorporates by reference the allegations made in paragraphs 1 to 107.

142.        Plaintiff seeks exemplary damages as Defendants' conduct amounted to actual fraud, malice, and/or gross negligence.   See, e.g., International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567, 584 (Tex. 1963); NRC, Inc. v. Huddleston, 886 S.W.2d 526, 533 (Tex. App. – Austin 1994, no writ).

143.        Further, Plaintiff seeks exemplary damages as the breach of fiduciary duty by Defendants was intentional.   International Bankers Life Ins. v. Holloway, 368 S.W.2d 567, 584 (Tex. 1963).

## IX.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## X.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff, respectfully requests that the Court enter an Order awarding the following relief:

(a)        Awarding compensatory and actual damages, including but not limited to, disgorgement of all attorneys' fees received by Defendants in connection with their representation of Plaintiff;

(b)        Awarding exemplary damages at the maximum amount allowable by Section 41.008 of the Texas Civil Practice and Remedies Code;

(c)        Awarding costs to Plaintiff;

(d)        Awarding pre- and post-judgment interest; and

(e)        Such other and further relief as the Court deems just and proper.

Dated:  June 23, 2019                    Respectfully submitted,

                                         BEGGS LANDERS LAW FIRM, PLLC

                                         By:/s/James M.Beggs _____
                                             **James M. Beggs**
                                             Texas Bar No. 02046500
                                             jim@beggslaw.com
                                             140 East Irving Boulevard
                                             Irving, Texas 75060
                                             Tel. (972) 253-8000
                                             Fax. (972) 253-9000

                                         By:   /s/Lynda Landers_____
                                             **Lynda Landers**
                                             Texas Bar No. 24000145
                                             Email:  Lynda@landerslegal.com
                                             1207 West University Suite 102
                                             McKinney, Texas 75069
                                             Tel. (972) 529-5707
                                             Fax. (972) 529-6708